**Case No. 3:24-cv-07370-GC**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| |
|---|
| In re:<br><br>THRASIO HOLDINGS, INC., *et al*.,<br><br>Debtors.[1] |
| JOSHUA SILBERSTEIN,<br>                           Appellant,<br>v.<br>THRASIO HOLDINGS, INC., *et al*.,<br>                           Appellees. |

**APPELLANT'S OPENING BRIEF**

Appeal from Order of the Bankruptcy Court for the District of New Jersey
Confirming a Reorganization Plan in Chapter 11 Case No. 24-11840 (CMG)

Mark S. Lichtenstein
Martin Domb (*pro hac vice* pending)
AKERMAN LLP
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Tel.: (212) 880-3800
mark.lichtenstein@akerman.com
martin.domb@akerman.com

John H. Thompson (*pro hac vice* pending)
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Tel.: (202) 824-1760
john.thompson@akerman.com

*Attorneys for Appellant, Joshua Silberstein*

---

[1] The last four digits of Debtor Thrasio Holdings, Inc.'s tax identification number are 8327. A complete list of the Debtors in these chapter 11 cases and each such Debtor's tax identification number may be obtained on the website of the Debtors' Claims, Noticing, and Solicitation Agent at https://www.kccllc.net/Thrasio. The Debtors' service address for purposes of these chapter 11 cases is 85 West Street, 3rd Floor, Walpole, MA 02081.

# Table of Contents

Preliminary Statement ..............................................................................1

Statement of Jurisdiction and Timeliness of Appeal ..............................3

Statement of the Issues on Appeal and Standard of Review ...................4

Statement of the Case..............................................................................6

    Silberstein Co-Founds Thrasio in April 2018 ................................6

    Silberstein Serves as Co-CEO of Thrasio
      From April 2018 to September 2021........................................6

    Thrasio Has Rapid Growth During Silberstein's Tenure ...............7

    Thrasio Files for Bankruptcy in February 2024 ...........................9

    The Disinterested Directors' Report............................................10

    The Confirmation Order and the Thrasio Legacy Trust...............11

    The Plan's Release, Injunction, and Gatekeeper Provisions........13

    Procedural History ......................................................................15

ARGUMENT

Summary of the Argument.......................................................................17

I.    The Plan Violates the Supreme Court's Holding in *Purdue*
     and Silberstein's Due Process Rights ...........................................18

    A.    The Nonconsensual Release Violates *Purdue*.....................18

    B.    The Release, Injunction, and Gateway Provisions
        Violate Silberstein's Due Process Rights...........................20

    C.    Consummation of the Plan to Date, in Whole or In Part,
        Does Not Prevent Post-Confirmation Amendment of the
        Violative Plan Provisions ...................................................26

II.     Silberstein's Purely Defensive Assertion of Third-Party Claims
        Under Federal Rule of Civil Procedure 14 Are Not
        Derivative Claims of the Reorganized Thrasio ...........................................29

Conclusion .........................................................................................................33

Certificate of Compliance ..................................................................................34

78119243;1

# Table of Authorities

**Cases**                                                                                   **Page(s)**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ...................................................................................24

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ...................................................................................28

*Derewecki v. Pennsylvania R. Co.*,
    353 F.2d 436 (3d Cir. 1965) .......................................................................25

*Goldberg v. Kelly*,
    397 U.S. 254 (1970) ...................................................................................25

*Harrington v. Purdue Pharma L. P.*,
    603 U.S. ___, 2024 WL 3187799 (June 27, 2024) ............. 3, 4, 17, 18-20, 26, 29

*In re Aegean Marine Petroleum Network, Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019) ..................................................23, 24

*In re Digital Impact*,
    223 B.R. 1 (Bankr. N.D. Okla. 1998) .........................................................23

*In re G-I Holdings, Inc.*,
    755 F.3d 195 (3d Cir. 2014) ................................................................. 29-30

*In re Imerys Talc Am., Inc.*,
    38 F.4th 361 (3d Cir. 2022) .........................................................................5

*In re Nuverra Environmental Solutions, Inc.*,
    834 Fed. Appx. 729 (2021) ....................................................................27, 28

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000) .......................................................................27

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989) .......................................................................6

78119243;1

*In re Somerset Reg'l Water Res., LLC,*
   949 F.3d 837 (3d Cir. 2020) ...............................................................................5

*In re Wilton Armetale,*
   968 F.3d 273 (3d Cir. 2020) .............................................................................30

*In re Zenith Electronics Corp.,*
   329 F.3d 338 (2003).....................................................................................27, 28

*Knap v. Bankers Securities Corp.,*
   230 F.2d 717 (3d Cir. 1956) .............................................................................31

*Logan v. Zimmerman Brush Co.,*
   455 U.S. 422 (1982)...........................................................................................22

*Martin v. Wilks,*
   490 U.S. 755 (1989)...........................................................................................22

*Meridian Bank v. Alten,*
   958 F.2d 1226 (3d Cir. 1992) ......................................................................... 5-6

*Patterson v. Mahwah Bergen Retail Group, Inc.,*
   636 B.R. 641 (E.D. Va. 2022) ..................................................................... 23-24

*Phillips Petroleum Co. v. Shutts,*
   472 U.S. 797 (1985)...........................................................................................22

*Price v. Gurney,*
   324 U.S. 100 (1945)...........................................................................................30

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) ...............................................................................30

*Tulsa Pro. Collection Servs., Inc. v. Pope,*
   485 U.S. 478 (1988)...........................................................................................22

*Winston & Strawn, LLP v. McLean,*
   843 F.3d 503 (D.C. Cir. 2016)...........................................................................24

78119243;1

**Statutes, Rules, and Other Authorities**

11 U.S.C. § 101(15) ...........................................................................13

11 U.S.C. § 1123(b) ..........................................................................19

28 U.S.C. §§ 157 and 1334 ..................................................................3

28 U.S.C. § 158(a) ..........................................................................3, 4

A. Levitin, "The Constitutional Problem of Nondebtor Releases in
    Bankruptcy," 91 Fordham L. Rev. 429 (2022)............................... 21-22

Del. Superior Court Rule of Civil Procedure 14......................................21

Federal Rule of Civil Procedure 14 ...........................2, 17, 21, 23, 24, 28

Federal Rule of Bankruptcy Procedure 7014............................................21

N.Y. Civil Practice Law & Rules § 1007 ...............................................21

N.J. Court Rule 4:8-1 ........................................................................21

*Standing Order of Reference to the Bankruptcy Court Under Title 11,*
    United States District Court for the District of New Jersey,
    entered July 23, 1984 .........................................................................3

78119243;1

Appellant, Joshua Silberstein ("Silberstein"), submits this opening brief in support of his appeal from the Bankruptcy Court's order entered on June 13, 2024, (A-484) ("Order"), by which the Bankruptcy Court confirmed a plan of reorganization ("Plan"), annexed to the Order (A-570 to A-635), of Thrasio Holdings, Inc. and its related debtor entities ("Thrasio" or "Debtors").[2]

## Preliminary Statement

By this appeal, Silberstein seeks very narrow relief:  a level playing field in a groundless and nonsensical post-confirmation litigation that the Plan proponents have targeted against him.  Silberstein does not seek to unravel the Plan; he seeks a modest modification of certain of its provisions in order to preserve his due process rights as a litigant.

Silberstein co-founded Thrasio in April 2018 and was its Co-CEO until he left the company three years and five months later, in September 2021.  He was not involved at all in Thrasio during the two years and five months between his departure and Thrasio's filing for bankruptcy on February 28, 2024.  The Plan nevertheless targets principally him, along with a handful of other "Excluded

---

[2]  Record references are as follows:  "A-___" refers to pages in the accompanying Appendix to Appellant's Opening Brief; "Bankr. Doc. ___" refers to a document in the Bankruptcy Court's docket in Case No. 24-11840 (CMG).  "Doc. ___" refers to a document in this Court's docket for this case.

Parties," as supposed wrongdoers who caused Thrasio's bankruptcy, while the Plan exonerates every other Thrasio former and current director, officer, and other insider.

The Plan as originally proposed set aside a paltry $250,000 for distribution to general unsecured creditors holding between $67 million and $385 million in claims – about a third of a penny per dollar based on the *lower* figure.[3]  That was unacceptable to the Unsecured Creditors Committee and their counsel.  To secure their support, the Plan created the Thrasio Legacy Trust ("Trust"), funded it with $5 million, directed it to sue Silberstein (and other Excluded Parties) on specious claims, and fashioned a "waterfall" by which a portion of the proceeds from those suits would be distributed to unsecured creditors (after repayment of the $5 million, payment of other fees, and distributions to higher-priority claimants).

The Plan then seriously goes astray by creating an uneven playing field for Silberstein, through its Release, Injunction, and Gatekeeper provisions.  Under those provisions, when Silberstein is sued he may not – without prior authorization by the same Bankruptcy Court that confirmed the Plan – assert a standard third-party (indemnification) claim, under Federal Rule of Civil Procedure 14, against other Thrasio insiders who, he will maintain, are responsible for all or part of the

---

[3]  During the plan confirmation hearing, the Bankruptcy Court described the initial set-aside of $250,000 for unsecured creditors as "a bit of a joke," adding, "I guess a lot of what we do might be a bit of a joke" (A-470, lines 14-20).

78119243;1

damages, if any, for which Silberstein may be found liable to the Trust. That is

contrary to the Bankruptcy Code, as the Supreme Court recently held in

*Harrington v. Purdue Pharma L. P.*, 603 U.S. ___, 2024 WL 3187799 (June 27,

2024) ("*Purdue*"), violates Silberstein's due process rights, and improperly

nullifies a Federal Rule of Civil Procedure that has statutory force.

      This Court should not compel Silberstein to defend himself with an arm tied

behind his back. It should modify the relevant Plan provisions and thereby

preserve Silberstein's due process right to make proper use of the Federal Rules of

Civil Procedure (which are also applicable in bankruptcy proceedings) in

defending himself from the Trust's claims, as any litigant is entitled to do.

## Statement of Jurisdiction and Timeliness of Appeal

      The Bankruptcy Court had subject-matter jurisdiction over this case under

28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the*

*Bankruptcy Court Under Title 11* of the United States District Court for the District

of New Jersey, entered July 23, 1984, and amended on September 18, 2012.

      This Court has appellate jurisdiction over the Order under 28 U.S.C.

§ 158(a), which states in relevant part that district courts "shall have jurisdiction to

hear appeals . . . (1) from final judgments, orders, and decrees" of a bankruptcy

court. The Order, which confirmed the Plan, is a final order, as it expressly states

78119243;1

(A-566, ¶ 153) ("This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a)").

This appeal is timely because the Order appealed from was entered on June 13, 2024 (A-484), and Silberstein filed the Notice of Appeal on July 12, 2024 (A-636).

## Statement of the Issues on Appeal and Standard of Review

### *Statement of Issues*

(a)    In his designation of the record on appeal and statement of issues on appeal (Doc. 2), Silberstein stated the issue on appeal as follows:

Two weeks ago, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L. P.*, 603 U.S. ___, 2024 WL 3187799 (June 27, 2024) ("*Purdue*"), in which the Court held that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." 2024 WL 3187799 at *11.  The issue to be presented in this appeal is:

1.    Whether the Order's and the Plan's Release, Injunction, Gatekeeper, and related provisions – which create, empower, fund, and encourage the Thrasio Legacy Trust to pursue claims against non-debtors Silberstein and a small number of other non-consensual Excluded Parties,

- 4 -

while enjoining the Excluded Parties from asserting, and otherwise restricting their right to assert, their own claims against a large number of other non-debtors (including the Debtors' former and current officers, directors, investors, creditors, shareholders, and other fiduciaries), who contributed nothing to the Plan but are nevertheless granted broad releases and other protections – violates the Supreme Court's holding in *Purdue* and applicable bankruptcy law.

(b)    Subsumed within that issue is whether such arrangement, in barring or restricting Silberstein's right to assert purely defensive third-party claims against non-debtors, who are liable for all or part of the claims the Trust may assert against Silberstein, violates Silberstein's due process right to defend himself against such claims by the Trust.

### *Standard of Review*

The issues on appeal concern legal determinations, which this Court reviews *de novo*.  *In re Imerys Talc Am., Inc.*, 38 F.4th 361, 370 (3d Cir. 2022) (district courts "review the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its discretionary decisions for abuse of discretion") (quoting *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 844 (3d Cir. 2020)). A court "must break down mixed questions of law and fact, applying the appropriate standard to each component."  *Meridian Bank v. Alten*, 958 F.2d 1226,

1229 (3d Cir. 1992) (quoting *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1989)).

## Statement of the Case

### Silberstein Co-Founds Thrasio in April 2018

Silberstein, along with Carlos Cashman ("Cashman"), co-founded Thrasio in April 2018. Thrasio's business was, and still is, to acquire businesses that sell consumer products through amazon.com or other e-commerce outlets and consolidate these businesses into Thrasio's platform, thereby expanding sales through economies of scale and other synergies. Thrasio was among the first companies to pursue this business model; they are known as "aggregators."

### Silberstein Serves as Co-CEO of Thrasio From April 2018 to September 2021

Silberstein and Cashman were the co-CEO's and also served as directors of Thrasio from its inception. Silberstein resigned as an officer of Thrasio on September 25, 2021, and as a director effective October 1, 2021. Cashman remained as CEO for another year, until September 2022, and as a director through at least May 2024 (*i.e.*, a few months after Thrasio filed for bankruptcy on February 28, 2024). (A-236 [Disinterested Directors' Report] [table].)

**Thrasio Has Rapid Growth During Silberstein's Tenure**

Thrasio's business grew rapidly during its first three years under the leadership of Silberstein and Cashman.  According to its *audited* annual financial statements, Thrasio had sales revenue of about $4 million in its first nine months, from inception through December 31, 2018; about $53 million in 2019; and about $345 million in 2020.  Sales revenue for 2021 (which ended three months after Silberstein's departure in September 2021) grew to about $891 million; it reached $1.26 billion in 2022 (the last year for which Thrasio gave Silberstein copies of its audited financial statements).  Thrasio was reported to have reached the $1 billion valuation faster than any other company.[4]

This growth, fueled significantly by increased e-commerce demand during the early stages of the Covid pandemic (which began in March 2020) required considerable financing, which Thrasio obtained via loans and equity investments. Before Silberstein's departure in September 2021, Thrasio issued several series of preferred shares to investors led by highly sophisticated private equity firms, as summarized in the following table:

---

[4]  As reported in a press release by Cooley LLP, which represented Thrasio in a July 2020 equity financing, "Thrasio Hits Unicorn Status With Series C Funding" (https://www.cooley.com/news/coverage/2020/2020-07-22-thrasio-hits-unicorn-status-with-series-c-funding) (last viewed September 24, 2024).

78119243;1

| Closing Date | Series | Lead Investor(s) | Amount Raised |
|---|---|---|---|
| April 2019 | Seed | Peak6 Group LLC | $6.5 million |
| Dec. 2019 / Feb. 2020 | Series A | Peak6<br>Upper90<br>Solamere Capital | $14.8 million |
| March / June 2020 | Series B | Peak6<br>Upper90 | $72.6 million |
| July / Aug. 2020 | Series C-1 | Advent International Corporation | $259.1 million |
| Feb. 2021 | Series C-2 | " | $250 million |
| March / May 2021 | Series C-3 | " | $100 million |
| Feb. & Aug. 2021 | Series X | Oaktree Capital Management, L.P. | $447 million |
| **Total** | | | $1.150 billion |

Sources:  Audited financial statements of Thrasio for the year 2020, Note 10 at 24-25; Declaration of Josh Burke, Chief Financial Officer of Thrasio Holdings, Inc., in Support of First Day Motions, at 13-15 (Bankr. Doc. 38); Disinterested Directors Report ¶ 45 (at A-252).

Thrasio later made an additional issuance of shares, Series D, which closed in October and December 2021, with private equity firms Silver Lake Partners and Advent as its lead investors.  The Series D transaction closed *after Silberstein's departure* in September 2021.  Thrasio has claimed that its board learned in August 2021 that Thrasio's unaudited financial statements, which it had provided to

- 8 -

investors, may not have been accurate (A-250, ¶ 40); *see also* section below headed "The Disinterested Directors' Report"). After learning about the financial statements' supposed inaccuracy in August, and after Silberstein left Thrasio in September, Thrasio and its board subsequently completed the Series D transaction, which closed in October and December. That financing raised over $1 billion on the basis – determined by the lead investors after thorough due diligence – that Thrasio at that time had a valuation of $6 billion.[5]

### Thrasio Files for Bankruptcy in February 2024

Thrasio filed its chapter 11 petition on February 28, 2024, two years and five months *after Silberstein had left Thrasio.* During that period, when Silberstein was not involved with Thrasio (except for his continuing to hold a large number of shares that became worthless upon the bankruptcy filing), Thrasio hired a series of senior officers and advisors, changed its roster of directors, and made business decisions, all of which contributed directly to Thrasio's bankruptcy filing.

---

[5]  News articles about the Series D issuance have cited the $6 billion valuation. *E.g.*, "Oaktree issues mea culpa to Advent and Silver Lake for 'serious error in judgment'" (https://wdctv.news/oaktree-issues-mea-culpa-to-advent-and-silver-lake-for-serious-error-in-judgment/) (last accessed September 24, 2024).

**The Disinterested Directors' Report**

On May 23, 2024, the Debtors filed with the Bankruptcy Court a "Plan Supplement" (A-258) that, with later "technical modifications," became part of the Plan. Exhibit G to the Plan Supplement was a summary "Disinterested Directors' Report" (A-226). The Disinterested Directors are two individuals appointed by Thrasio's board in September 2023 – about five months before Thrasio filed for bankruptcy – to investigate "potential estate causes of action against the Debtors' current or former directors, managers, officers, equity holders, subsidiaries, affiliates, and other related parties" (A-233).

Their report cynically concludes that the Debtors: (a) "potentially" have certain causes of action against four former officers and directors of Thrasio, led by Silberstein, whom the report defines as "Excluded Parties," and possibly against certain other persons involved in the so-called "Yardline" transactions (A-236-37), but (b) have no viable causes of action against the scores of other former or then-current officers, directors, managers, or other persons who operated or made critical decisions for Thrasio both before and after Silberstein left Thrasio in September 2021.

The Disinterested Directors' Report nevertheless contains findings and statements that significantly undermine its self-serving and illogical conclusions that identified "potential" claims against Silberstein and a handful of others while

exonerating everyone else.  For example, *after* they say the Thrasio board learned in mid-August 2021 that Silberstein supposedly may have disseminated inaccurate financial statements and *after* Silberstein left Thrasio in September 2021 (A-250, ¶ 40), Thrasio's officers and board nevertheless proceeded to conclude the Series D equity financing – which closed in October and December 2021 – by which sophisticated investor groups, after thorough due diligence, invested over $1 billion in Thrasio on the basis that Thrasio at that time – again, *after* Silberstein's departure – had a value of $6 billion.  As the Disinterested Directors stated it:

> … it is important to note that nearly all of the Yardline Transfers occurred prior to the October 2021 initial closing of the Series D Preferred Stock Financing, in which sophisticated third parties (such as Advent and Silver Lake) invested more than $1 billion in Thrasio's equity after engaging in due diligence.  As a result, Thrasio likely had significant equity value at the time of most, if not all, of the Yardline Transfers ….

(A-252, ¶ 45.)

**The Confirmation Order and the Thrasio Legacy Trust**

The initial reorganization plan proposed by the Debtors, on April 18, 2024, provided a measly $250,000 for distribution to general unsecured creditors (Bankr. Doc. 398 at 8 [defining "GUC Recovery Pool"]), which collectively held claims totaling:  (a) according to the Debtors, about $67 million (Bankr. Doc. 397 at 109 [showing 0% recovery for unsecured creditors holding $67 million in claims]); and

(b) according to the certified votes on the Plan, about $385 million (Bankr. Doc. 1100 at 6 [table showing ballots received and amounts claimed]).[6]

This obviously was unacceptable to the Unsecured Creditors Committee ("Committee"), their counsel, and holders of unsecured claims.  To appease them, and secure the votes of unsecured creditors to confirm a plan, the plan proponents devised a cynical scheme:  sue Silberstein and a handful of others, on dubious claims that they supposedly harmed Thrasio and caused its bankruptcy, and distribute *a portion* of the proceeds from those suits to unsecured creditors (after recovery of costs and distributions to others).  To accomplish this, the Plan established the Trust, funded it with $5 million, and empowered it to pursue claims against Silberstein and the few other Excluded Parties.  (A-588-89, definitions 163-177.)[7]

---

[6]  Even the much lower and likely understated $67 million assumed by the Debtors is a cruel twist on the proverbial "pennies on the dollar" – $250,000 spread over $67 million amounts to about one-third of a penny per dollar.

[7]  Distributions from any lawsuit proceeds are governed by a "waterfall" provision in the Plan (A-605-06, ¶ 6) that would distribute:  (a) the first $5 million – 80% to the Debtors and 20% to the Trust; (b) additional amounts – 70% to holders of Allowed First Lien Deficiency Claims ("A Interests") and 30% to holders of Allowed Other General Unsecured Claimants ("B Interests") until the A Interests have received $3.5 million; and (c) further additional amounts – split 50/50 between the A Interests and the B Interests.

**The Plan's Release, Injunction, and Gatekeeper Provisions**

Not satisfied with the scheme to sue Silberstein (and a handful of other Excluded Parties) with the hope of funding some distribution to unsecured creditors, the Plan proponents improperly tilted the playing field to make it more difficult for Silberstein to defend himself.

*Debtor Release*.  *First*, the Plan includes a "Debtor Release" (A-623-24) whereby the Debtors release all claims against any "Released Party," defined to include everyone associated with the Debtors and the Plan, including all current and former Thrasio directors and officers, lenders, agents, and advisors, and excepting only the Excluded Parties (A-585, definition 132).  In other words, the Plan exonerates everyone except Silberstein and the few other Excluded Parties.[8]

*Injunction*.  *Second*, the Plan includes a broad "Injunction" (A-625) that prohibits "all Entities"[9] that have claims from commencing or continuing any action against any Released Parties.  In other words, Silberstein, a nonconsenting non-debtor, is enjoined from suing other non-debtors, such as any current or former Thrasio officer or director or other Released Parties.

---

[8]  The Debtor Release does not cover "actual fraud or willful misconduct" by a Released Party (A-623).

[9]  "Entity" is defined (A-580) as having "the meaning set forth in section 101(15) of the Bankruptcy Code" – an all-inclusive term that "includes person, estate, trust, governmental unit, and United States trustee."  11 U.S.C. § 101(15).  Silberstein thus is an Entity and subject to the Injunction.

- 13 -

*Gatekeeper Provision*.  *Third*, this feature of the Plan – described in the Order (A-493, ¶ 15) and embedded in Article VIII.F of the Plan (A-624-25) – creates yet another restriction on the rights of Silberstein and other Excluded Parties.  It provides that the Trust may sue Excluded Parties without "any requirement to first obtain an order from the Bankruptcy Court" (Order, A-493, ¶ 15).  An Excluded Party that wants to assert third-party claims against Released Parties, however, such as former Thrasio officers and directors who are not Excluded Parties – may not do so unless the Bankruptcy Court, having "sole and exclusive jurisdiction" in this regard, pre-authorizes the Excluded Party to assert such a claim.  (A-625, ¶ H [permanently enjoining Entities from "commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan"]).

*   *   *

The arrangement embodied in the Release, Injunction, and Gatekeeper provisions violates Silberstein's constitutional due process rights, as discussed in Point I below.

78119243;1

**Procedural History**

Thrasio filed a chapter 11 petition on February 28, 2024.

On May 3, 2024, Silberstein filed essentially identical proofs of claim against each of two Debtors (A-202, A-214). Silberstein thereby asserted his rights under releases, indemnification, and other provisions of a *Confidential Separation Agreement and Mutual Release* dated September 25, 2021, between those two Debtors and Silberstein (the "Separation Agreement").[10]

On June 3, 2024, Silberstein submitted a ballot by which he voted to reject the then-proposed reorganization plan (*see* Bankr. Doc. 1100, page 23 of 24 [Silberstein included among creditors that voted to "Opt Out of Release"]).

On June 5, 2024, Silberstein filed a limited objection to the version of the Debtors' proposed plan of reorganization then in effect (A-316); Silberstein summarized his objections in the introduction:

> First, the Plan appears to deny Silberstein … certain critically important contractual and legal rights without due process of law. Second, the Plan contains overly-broad releases made available to Thrasio insiders who were chiefly responsible for the company's management for over two years of its descent into bankruptcy, and seem[ing]ly without thorough investigation. Finally, the Plan appears to retain the broadest

---

[10] The Plan purports to reserve Thrasio's right to challenge the validity and enforceability of the Thrasio-Silberstein separation agreement (A-589 [definition of Vested Causes of Action]), even though the Disinterested Directors concluded that "Thrasio obtained numerous benefits in entering into the Separation Agreement" and, therefore, "there are no viable claims worthy of pursuit with respect to Thrasio's entry into the Separation Agreement" (A-253, ¶ 48).

78119243;1

> possible set of potential claims against Silberstein
> notwithstanding the Independent Investigation … and
> Silberstein's contractual and legal rights.  Accordingly, the
> Debtors' Plan should be modified to eliminate these prejudicial
> harms.

(A-317.)

On June 10, 2024, a hearing was held in the Bankruptcy Court on the then-latest version of a proposed reorganization plan (A-423 [transcript]; *see also* Bankr. Doc. 113 [agenda for hearing, including list of various plan versions submitted through that date]).  Silberstein appeared at that hearing by counsel, who briefly summarized Silberstein's objection to the proposed plan (A-453-55).

On June 13, 2024, (a) the Debtors filed their last version of the reorganization plan (Bankr. Doc. 1125); and (b) the Bankruptcy Court entered its Order confirming the Plan (A-484).

On June 27, 2024, the Supreme Court issued its decision in *Purdue*, in which the Court held that involuntary releases of claims of non-debtors against other non-debtors are not authorized by and thus violate the Bankruptcy Code.

Later that same day, June 27, 2024, Silberstein timely filed a notice of appeal from the Order (A-636).

# ARGUMENT

## *Summary of the Argument*

1.      The Plan, by its Release, Injunction, and Gatekeeper provisions,

violates the Bankruptcy Code, as the Supreme Court recently held in *Purdue*, in

that it bars or restricts the right of Silberstein, a nonconsenting non-debtor, to assert

claims against other non-debtors.  (Point I.A.)

2.      When he is sued, Silberstein should have all of his due process rights

to defend himself.  The Federal Rules of Civil Procedure have the force of law,

and, therefore, neither a court nor a reorganization plan may nullify them.  That

includes a third-party (or indemnification) claim under Rule 14.  No one could

reasonably argue that a defendant may not assert affirmative defenses, obtain

documentary or deposition discovery, subpoena witnesses, or make use of other

federal rules.  Why should the right to assert a third-party claim under Rule 14 be

different?  A litigant's right to join adverse persons *as parties*, so he may

confront and cross-examine them without having to serve them with subpoenas,

has long been recognized as a due process right.  (Point I.B.)

3.      That the Plan was confirmed in June 2024 and may have been

substantially consummated does not moot this appeal or bar the limited relief

Silberstein seeks.  The equitable mootness doctrine does not apply when, as in this

case, the appellant seeks merely a slight modification to a reorganization plan,

which would not unravel the plan. Because a court having jurisdiction over an appeal in a bankruptcy case has a "virtually unflagging obligation" to exercise that jurisdiction, equitable mootness is a very narrow exception that a court should rarely apply. (Point I.C.)

4. Finally, the third-party claims that Silberstein expects to assert are his own claims and *not* derivative claims of the corporation. Silberstein would assert such claims purely defensively. If successful, they would yield no benefit to Thrasio; they would merely diminish, in whole or in part, the damages, if any, for which Silberstein may be found liable to the Trust. (Point II.)

## I.    The Plan Violates the Supreme Court's Holding in *Purdue* and Silberstein's Due Process Rights

### A.    The Nonconsensual Release Violates *Purdue*

On June 27, 2024 – two weeks after the Bankruptcy Court entered the Order confirming the Plan – the Supreme Court held in *Purdue* that involuntary releases of claims of non-debtors against other non-debtors are not authorized by and thus violate the Bankruptcy Code.

The debtor in *Purdue* was Purdue Pharma L.P. ("Purdue Pharma"), which was owned by members of the Sackler family. Purdue Pharma was at the center of this nation's opioid epidemic, having profited immensely from its aggressive marketing of its branded opioid pain reliever, OxyContin. The Sacklers faced

thousands of lawsuits from victims of OxyContin, but they did not file for

bankruptcy.  Instead, they offered to contribute to the debtor between $5.5 and $6

billion dollars for future distribution to victims, but only in exchange for full

releases from their own personal liability.  *Purdue* at *3-5.

The plan in *Purdue* thus, like the one in this case, included a release and an

injunction.  The release would have banned all claims against the Sacklers by

anyone, including nonconsenting claimants.  *Id*. at *4.  To enforce the release, the

plan in *Purdue* also included an injunction, which would have prohibited suits

against all Sackler family members as well as the company's officers and directors.

The Supreme Court held in *Purdue* that "the bankruptcy code does not

authorize a release and injunction that, as part of a plan of reorganization under

Chapter 11, effectively seeks to discharge claims against a nondebtor without the

consent of affected claimants."  *Id*. at *11.  The Court's majority so held despite

the facts that:  (a) the Sacklers were prepared to contribute a very large amount, up

to $6 billion, to the plan for victim compensation, (b) "virtually all of the opioid

victims and creditors … fervently support[ed] the plan" (*id*. at *12 [dissenting

opinion]); and (c) "all 50 state Attorneys General have signed on to the plan – a

rare consensus" (*id*.).

The Court in *Purdue* stated that Bankruptcy Code section 1123(b), 11 U.S.C.

§ 1123(b) – which lists the kinds of provisions a reorganization plan may include –

gives bankruptcy courts broad authority "to adjust claims without consent only to the extent such claims concern *the debtor*." *Purdue* at *7 (emphasis added). That section *does not* grant such power with respect to claims of nonconsenting non-debtors against other non-debtors. As the Court stated, "a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors … against other nondebtors." *Id*. at *8.

Like the plan in *Purdue* that the Supreme Court held was invalid, the Plan in this case releases and exonerates a large number of *non-debtors* from liability and enjoins the assertion against them of third-party claims, held by *other non-debtors*, such as Silberstein, who did not consent to the Plan. In that respect, the Order and the Plan are contrary to *Purdue* and the Bankruptcy Code and cannot stand.

### B.    The Release, Injunction, and Gatekeeper Provisions Violate Silberstein's Due Process Rights

The Release, Injunction, and Gatekeeper Provisions violate Silberstein's fundamental and constitutional due process right to defend himself on the claims that the Plan empowers the Trust to assert against him.

The Trust will claim that Silberstein engaged in both negligent and intentional wrongdoing that supposedly led to Thrasio's downfall (*see* Disinterested Directors' Report, A-236-37, ¶¶ 6-8; Plan, A-589, definition of Vested Causes of Action). Silberstein will deny any liability and, as a defendant in

his situation is entitled to do, will assert that, should he be found liable to the Trust, then other persons – certain former or current Thrasio officers, directors, and/or advisors – would be liable for all or part of the amount for which Silberstein is found liable.  The right to bring such third-party or indemnification claims is codified in Federal Rule of Civil Procedure 14 (which applies in bankruptcy cases under Federal Rule of Bankruptcy Procedure 7014).  Such right also is available generally under state law.  *E.g.*, N.Y. Civil Practice Law & Rules § 1007; Del. Superior Court Rule of Civil Procedure 14; N.J. Court Rule 4:8-1.

The Plan deprives Silberstein of that fundamental right.  Silberstein may not assert a Rule 14 third-party claim without first applying for and obtaining approval from the Bankruptcy Court (A-624 [stating that persons such as Silberstein "may not assert any claim … against any Released Party … without first obtaining a Final Order from the Bankruptcy Court … specifically authorizing such Person … to bring such claim," and "the Bankruptcy Court will have sole and exclusive jurisdiction" to make that determination]).

Depriving a non-debtor of his right to bring a third-party claim against another non-debtor – or placing restrictions on his right to do so beyond the requirements of Rule 14 – is a due process violation.  *See* A. Levitin, "The Constitutional Problem of Nondebtor Releases in Bankruptcy," 91 Fordham L.

Rev. 429 (2022).  As Levitin, Professor at Georgetown University Law Center, there stated:

> Due process also prohibits parties from being deprived of property without getting their proverbial "day in court" in some form.
>
> Nonconsensual nondebtor releases are inconsistent with such due process requirements. Creditors who have direct claims against nondebtors have property interests:  their direct claims are "choses in action."  Like other types of property interests, these choses in action are protected under the Due Process Clause.

*Id*. at 440 (footnotes omitted), citing *Martin v. Wilks*, 490 U.S. 755, 761-62, 768 (1989) (noting the "deep-rooted historic tradition that everyone should have his own day in court" and that "[a] voluntary settlement … cannot possibly settle, voluntarily or otherwise, the conflicting claims of [those] who do not join in the agreement" (internal quotation marks omitted)); *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) ("Little doubt remains that [a cause of action] is property protected by the Fourteenth  Amendment."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985) ("[A] chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs."); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.").

78119243;1

A third-party claim under Rule 14 is a chose-in-action, which, therefore, is protected by the due process clauses in the Fifth and Fourteenth Amendments, as confirmed by the above-cited Supreme Court decisions.

Bankruptcy courts also have recognized that nonconsensual releases of non-debtors are improper because, among other reasons, they deprive non-debtor claimants of their due process rights.  In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019), for example, Bankruptcy Judge Michael E. Wiles declined to confirm a plan that contained nonconsensual releases of certain non-debtors, including three of the debtor's directors, because that would have violated due process rights of non-debtors that might have claims against them.  As Judge Wiles stated:

> In the American system, litigants have the right to assert claims so long as they meet pleading standards and Rule 11 standards.

*Id*. at 725.  As Judge Wiles further noted, imposing an involuntary release of non-parties on a non-debtor claimant amounts to a taking of the claimant's property "without any hearing on the merits and without any of the discovery or other rights that a litigant usually would have."  *Id*., citing *In re Digital Impact,* 223 B.R. 1, 13 n. 6 (Bankr. N.D. Okla. 1998) (noting that a third-party release has "the effect of a judgment … against the claimant and in favor of the non-debtor, accomplished without due process").  *See also Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641, 655 (E.D. Va. 2022) (vacating a release and related provisions of a

reorganization plan that would have "close[d] the courthouse doors to an immeasurable number of potential plaintiffs, while protecting corporate insiders who had no role in the reorganization of the company").

Judge Wiles' reference in *In re Aegean* to discovery and other rights enjoyed by any litigant is especially apt in this case. A litigant is entitled to make use of *all* rights and safeguards afforded by the Federal Rules of Civil Procedure; that includes the rights, not only to file pleadings, make motions, and take depositions, but also to bring third-party actions under Rule 14.

Further, a reorganization plan may not, directly or indirectly, nullify a right established in the Federal Rules of Civil Procedure, nor may a court do so. "The Federal Rules are 'as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the ... mandate [of a Federal Rule] than they do to disregard constitutional or statutory provisions.'" *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 506 (D.C. Cir. 2016) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988)). The Plan, thus, improperly nullifies Silberstein's rights under Rule 14.

The Plan *purports* to preserve Silberstein's right to assert that other non-debtors, not he, are responsible for any claims alleged by the Trust. The Order describes the Injunction as follows:

> No party's legal and equitable defenses and rights to setoffs
> and/or recoupment shall be affected, diminished, or impaired by

- 24 -

> the Plan, this Confirmation Order, the Plan Supplement, or the
> Definitive Documents, and such rights are expressly preserved.

(Order, A-555, ¶ 125.)

That the Order so states does not make it so. As noted above, in defending himself from the Trust's claims, absent the Bankruptcy Court's prior approval, Silberstein will be prohibited from bringing in third parties who, Silberstein will maintain, were liable for alleged damages that the Trust will seek to recover from him. These improperly exonerated persons would not have to appear in court, in contrast to Silberstein. In seeking to show that these other persons, and not Silberstein, are liable, Silberstein and his counsel would have to accuse "empty chairs," and would have none of the rights that a party is entitled to with respect to other named parties – such as to obtain their documents, take their depositions, or call them as witnesses and cross-examine them at trial without the need of subpoenas. *See Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *Derewecki v. Pennsylvania R. Co.*, 353 F.2d 436, 442 (3d Cir. 1965) ("the right of cross-examination inheres in every adversary proceeding and … it is established beyond any necessity for citation of authorities, with certain exceptions not pertinent here, that if cross-examination of an available witness is not had the litigant, deprived of cross-examination, has been denied due process of law").

- 25 -

The supposed reservation of rights of Excluded Parties such as Silberstein in the above-quoted text of the Order is, thus, illusory. The Release, Injunction, and Gatekeeper provisions in the Plan would function as both a sword and a shield for the Trust: *it* may freely assert dubious claims against Silberstein and the other small number of Excluded Parties, while these few targets are restricted from properly defending themselves and asserting claims against culpable persons whom the Plan improperly exonerates. These provisions not only violate the Supreme Court's holding in *Purdue*; they also deprive Silberstein of his due process rights as a litigant.

### C.     Consummation of the Plan to Date, in Whole or In Part, Does Not Prevent Post-Confirmation Amendment of the Violative Plan Provisions

The Supreme Court in *Purdue* did not decide "whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated." *Purdue* at *11.

That the Plan in this case was confirmed months ago (on June 13, 2024) and may already have been substantially consummated does not moot this appeal or prevent the Court from granting Silberstein the relief he requests. That is because Silberstein does not seek to unwind the Plan. He insists only that the Plan's provisions that would deprive him of his due process rights be modified to avoid that deprivation.

- 26 -

Courts in this Circuit have applied the "equitable mootness" doctrine in deciding whether to rule on the merits of an appeal from a reorganization plan that has been substantially consummated. *In re Nuverra Environmental Solutions, Inc.*, 834 Fed. Appx. 729 (2021); *In re Zenith Electronics Corp.*, 329 F.3d 338 (2003). The Third Circuit made clear in *Zenith* that substantial consummation of a plan "is not sufficient" to moot an appeal. 329 F.3d at 344. The key question is "not simply whether the plan ha[s] been substantially consummated according to the Code definition, but rather whether 'the appeal, if successful, would necessitate the reversal or unraveling of the entire plan of reorganization.'" *Id.* (quoting *In re PWS Holding Corp.,* 228 F.3d 224, 236 (3d Cir. 2000)).

The appellant in *PWS* argued that releases in the plan, which had already been substantially consummated, violated priority rules in the Bankruptcy Code. The panel in *PWS* nevertheless declined to dismiss the appeal as moot. The court in *Zenith* explained why: "Because the panel determined that a successful appeal would not knock the props out from under the authorization for every transaction that has taken place, and that there were intermediate options short of undoing the entire plan, it declined to dismiss the appeal as equitably moot." *Zenith*, 329 F.3d at 344 (internal quotation marks and citation omitted). The *Zenith* court noted that in *PWS*, the appellant sought "only alterations to the plan rather than an unraveling

- 27 -

of the reorganization," and thus did not "undermine the Plan's foundation." *Id*. at 345.

Equally important is the principle, also applied in *Zenith*, that when a court has jurisdiction to hear an appeal, it has a "virtually unflagging obligation" to exercise that jurisdiction. *Id*. at 347 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). That obligation necessarily means that the equitable mootness doctrine "is a very limited and well-defined exception" that applies "only in that rare situation in which a successful appeal would undo a complicated plan of reorganization." *Zenith*, 329 F.3d at 347. The Third Circuit reaffirmed this principle in its 2021 decision in *Nuverra*, 834 Fed. Appx. at 733 ("There is a strong presumption that appeals from confirmation orders of reorganization plans ... need to be decided …, and a court may fashion whatever relief is practicable instead of declining review simply because full relief is not available.") (internal quotation marks, brackets and citation omitted).

By this appeal, Silberstein does not seek to unravel the Plan. The slight modification he seeks – permitting him to assert Rule 14 third-party claims in *defending* himself against the Trust's claims – would not affect any transactions authorized by the Plan. The only persons who would be affected are certain Thrasio insiders, such as directors and officers, whom Silberstein may name as third-party defendants in a lawsuit that the Trust brings against Silberstein. Those

- 28 -

potential third-party defendants are not themselves debtors. They contributed no assets to Thrasio or the funding for the Plan. The Bankruptcy Code does not authorize courts to release such non-debtors from claims by other non-debtors, as the Supreme Court held in *Purdue*.[11] And, importantly, the outcome of any third-party claim Silberstein may assert against any of them would not result in the reorganized Thrasio receiving or having to pay any funds to anyone; a successful third-party claim by Silberstein would merely reduce his liability, if any, to the Trust (as further addressed in Point II below). Thrasio would be free to honor its release of its own claims against any such third-parties.

## II.    Silberstein's Purely Defensive Assertion of Third-Party Claims Under Federal Rule of Civil Procedure 14 Are Not Derivative Claims of the Reorganized Thrasio

Silberstein's contemplated third-party claims are *not* derivative because they are not those of a shareholder or creditor claiming that a defendant harmed the corporation and thus, indirectly, harmed *all* of its shareholders and creditors. *That* is the definition of a derivative claim. *See In re G-I Holdings, Inc.*, 755 F.3d 195,

---

[11] The lack of contributions to the Plan by these potential third-party defendants is in stark contrast with the non-debtor members of the Sackler family in *Purdue*. The Sacklers agreed to contribute $5.5 to $6 billion for distribution to non-debtor claimants. *Purdue* at *4 (initial offer of $4.325 billion) and *5 (additional offer of $1.175 to 1.675 billion). The Court nevertheless held that the plan's release and injunction provisions, which would have barred actions against the Sacklers by nonconsensual claimants, were not authorized by the Bankruptcy Code.

207 (3d Cir. 2014) (a derivative claim is brought "on behalf of a corporation for harm done to the corporation with recovery going to the corporation"); *Price v. Gurney*, 324 U.S. 100, 105 (1945) ("A derivative action is a suit by a shareholder to enforce a corporate cause of action…. And the relief which is granted is a judgment against a third person *in favor of the corporation*.") (emphasis added). *See also In re Wilton Armetale*, 968 F.3d 273, 282 (3d Cir. 2020) (a derivative claim "inures to the benefit of all creditors by enlarging the estate") (internal quotations and citation omitted).

As the Delaware Supreme Court has held, determining whether a stockholder's claim is derivative or direct turns "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"). *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (applying Delaware law).

Silberstein *was* a Thrasio shareholder at the time Thrasio filed for bankruptcy. Although he had sold some of his shares in 2021, he continued to hold a much larger number of shares through the petition date, which lost all their value because of the bankruptcy and Plan. But Silberstein does *not* seek to assert claims for that diminution in value. Rather, Silberstein wishes to assert claims *as a*

- 30 -

*defendant* in a lawsuit *by the corporation (acting through the Trust) against him*. And the aim of Silberstein's claims is *not* to obtain a benefit for the corporation, its shareholders, or creditors, but rather, and merely, to diminish his liability, if any, to the corporation. A successful third-party claim by a *defendant* whom a corporation has sued, which results in the corporation recovering *less* from the defendant, is a *direct* claim that belongs to the defendant, not a derivative claim that belongs to the corporation.

The Third Circuit has so held in analogous circumstances: an action by certain shareholders to compel the corporation to declare and pay a dividend to all shareholders. *Knap v. Bankers Securities Corp.*, 230 F.2d 717 (3d Cir. 1956) (applying Pennsylvania law applicable to derivative actions). As the court in *Knap* explained, in a derivative claim, it is "the rights *of the corporation* which are sought to be vindicated and *restitution is made directly to the corporation* by the entry of a judgment in *its* favor." *Id*. at 720 (emphasis added). In deciding whether a claim to compel dividends falls within this classic definition, the court considered "who is the injured party, the shareholder or the corporation, and who will be benefited if the action is brought to a successful conclusion." *Id*. at 721. A claim to compel dividends, the court concluded, belongs to the shareholder-claimants, not the corporation, because if successful, it "will benefit only the

shareholders…. Certainly it cannot be a benefit to a corporation, as such, to lose assets, even to its shareholders." *Id*. at 722.

The same is true in this case. A successful third-party claim by Silberstein would yield no benefit to Thrasio. Nor would the third-party defendant be required to pay his or her share of the liability to Thrasio, because Thrasio released its claims against him or her.[12] *Silberstein* would benefit, though merely by having his liability, if any, reduced by the third-party's share of the culpability. Echoing *Knap*, certainly it cannot be a benefit to the Trust (suing on behalf of Thrasio) to receive a portion or none of the damages for which Silberstein may be found liable to the Trust because a third-party is found to have caused or contributed to that loss.

In sum, the narrow but important due process rights that Silberstein hereby seeks to protect – in particular, the right as a non-debtor defendant to assert Rule 14 third-party claims against certain other non-debtors – belongs to him personally, not to Thrasio (or the Trust).

---

[12] To the extent a third-party claim by Silberstein against a released party causes that party to incur litigation expense that Thrasio promised it would avoid, that was a promise *by Thrasio*, which legally cannot bind Silberstein from asserting claims that he *personally* holds.

## Conclusion

For the foregoing reasons, the Court should enter an order modifying the Order and Plan to provide that neither the Release, Injunction, or Gatekeeper provision, nor any other provision or part of the Order or Plan, shall restrict the right of Silberstein, if and when sued by the Trust, to assert third-party claims: (a) under Federal Rule of Civil Procedure 14, if such suit is brought in a United States district court, (b) under Federal Rule of Bankruptcy Procedure 7014 (which incorporates Rule 14), if such suit is brought in a bankruptcy court, or (c) under a state law's equivalent rule, if such suit is brought in a state court.

Dated: September 25, 2024

AKERMAN LLP

s/ Mark S. Lichtenstein
Mark S. Lichtenstein
mark.lichtenstein@akerman.com
Martin Domb (*pro hac vice* pending)
martin.domb@akerman.com
1251 Avenue of the Americas, 37th Floor
New York, New York 10020
Telephone: (212) 880-3800

-and-

John H. Thompson (*pro hac vice* pending)
john.thompson@akerman.com
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 824-1760

*Counsel for Appellant, Joshua Silberstein*

78119243;1

## Certificate of Compliance

Pursuant to Fed. R. Bankr. P. 8015(a)(7)(C), the undersigned hereby certifies that:

1.     This brief complies with the type-volume limitations of Fed. R. Bankr. P. 8015(a)(7)(B) because the brief contains 7,315 words [maximum 13,000], excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g).

2.     This brief complies with the typeface requirements of Fed. R. Bankr. P. 8015(a)(5) and type style requirements of Fed. R. Bankr. P. 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman.

Dated:  September 25, 2024

s/ Mark S. Lichtenstein
Mark S. Lichtenstein
AKERMAN LLP

78119243;1